**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MELVYN KLEIN, Derivatively On Behalf Of CROWN CASTLE INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> v. <br><br> P. ROBERT BARTOLO, JAY A. BROWN, CINDY CHRISTY, ARI Q. FITZGERALD, ROBERT E. GARRISON II, ANDREA J. GOLDSMITH, LEE W. HOGAN, EDWARD C. HUTCHESON, JR., J. LANDIS MARTIN, ROBERT F. MCKENZIE, ANTHONY J. MELONE, AND W. BENJAMIN MORELAND, <br><br> Defendants, <br><br> CROWN CASTLE INTERNATIONAL CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Melvyn Klein ("Plaintiff"), derivatively and on behalf of Crown Castle International Corp. ("Crown Castle" or the "Company"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Crown Castle, Company press releases and conference call transcripts, and media reports about the Company.  Plaintiff believes that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a shareholder derivative action brought in the right, and for the benefit, of Crown Castle against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between February 27, 2018 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violation of Sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### A.    Plaintiff

4.    Plaintiff Melvyn Klein is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

**B.**     **Nominal Defendant**

5.      Nominal Defendant Castle Crown purports to own, operate and lease more than 40,000 cell towers and more than 75,000 route miles of fiber supporting small cells and fiber solutions across every major U.S. market.

**C.**     **Directors**

6.      ***Defendant P. Robert Bartolo*** ("Bartolo") has been a director since 2014.  He is also the Chair of the Audit Committee and a member of the Compensation Committee.

7.      ***Defendant Jay A. Brown*** ("Brown") has been a director since 2016.  He is also the President and Chief Executive Officer ("CEO") of the Company.

8.      ***Defendant Cindy Christy*** ("Christy") has been a director since 2007.  She is also a member of the Nominating & Corporate Governance ("NCG") Committee and the Strategy Committee.

9.      ***Defendant Ari Q. Fitzgerald*** ("Fitzgerald") has ben a director since 2002.  He is also Chair of the NCG Committee and a member of the Compensation and Strategy committees.

10.     ***Defendant Robert E. Garrison II*** ("Garrison") has been a director since 2005.  He is also a member of the Audit and Compensation committees.

11.     ***Defendant Andrea J. Goldsmith*** ("Goldsmith") has been a director since 2018.  She is also a member of the NCG and Strategy committees.

12.     ***Defendant Lee W. Hogan*** ("Hogan") has been a director since 2001.  He is also a member of the Audit, Compensation and Strategy committees.

13.     ***Defendant Edward C. Hutcheson, Jr.*** ("Hutcheson") has served as a director since 1999.  He is also a member of the Strategy Committee.

14.     ***Defendant J. Landis Martin*** ("Martin") has served as a director since 1999.  He is

also a member of NCG Committee.

15.     **Defendant Robert F. McKenzie** ("McKenzie") has served as a director since 1995. He is also a member of the Audit and Strategy committees.

16.     **Defendant Anthony J. Melone** ("Melone") has served as a director since 2015. He is also a member of NCG Committee and is the Chair of the Strategy Committee.

17.     **Defendant W. Benjamin Moreland** ("Moreland") has served as a director since 2006. He is also a member of the Strategy Committee.

18.     Defendants Bartolo, Brown, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone and Moreland are collectively hereinafter referred to as the "Director Defendants."

19.     The Directors Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of Castle Crown securities during the Relevant Period. The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Castle Crown's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

**Officer Defendant**

20.     **Defendant Daniel K. Schlanger** ("Schlanger") has served as the Company's Chief Financial Officer ("CFO"), Senior Vice President, and Treasurer during the Relevant Period.

21.     The Director Defendants and Defendant Schlanger are herein referred to as the "Individual Defendants."

**THE AUDIT COMMITTEE CHARTER**

22.     The Audit Committee Charter states in relevant part:

The Audit Committee ("Committee") is established by the Board of Directors ("Board") of Crown Castle International Corp. ("Company") to assist the Board in its fiduciary responsibilities to the Company's stockholders ("Stockholders"). The Committee's function *is an oversight role relating to the Company's financial statements and accounting practices*. In particular, the purpose of the Committee is to serve as an independent and objective party to:

- oversee the quality and integrity of the financial statements and other financial information the Company provides to any governmental body or the public;
- oversee the Company's compliance with legal and regulatory requirements;
- oversee the qualifications and independence of the Company's independent external auditors ("Auditors");
- oversee the performance of the Company's internal audit function and the Auditors; and
- oversee the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics.

*       *       *

In connection with the purpose, powers and responsibilities set forth above, the Committee shall also endeavor to:

Independent Auditors

1. Annually select and engage the Auditors retained to audit the financial statements of the Company.

2. Review and pre-approve the plan and scope of the Auditors' auditing services (including comfort letters), non-audit services and related fees, with such non-audit services approved by the Committee to be disclosed, as may be required, in the Company's periodic reports filed with the Securities and Exchange Commission ("SEC").

3. Review the performance of the Auditors and approve any proposed discharge of the Auditors when circumstances warrant.

4. Ensure that the lead audit partner and reviewing audit partner of the Auditors are rotated at least every five years.

5. Establish policies or guidelines for hiring employees or former employees of the Auditors.

6. Periodically review the independence of the Auditors, including a review of relationships between the Auditors and the Company, including non-audit related services and fees. Discuss with the Auditors concerns relating to the

Auditors' objectivity and independence, and if necessary, take appropriate action relating to the independence of the Auditors.

7. Periodically obtain and review reports from the Auditors that include (i) critical accounting policies and practices used; (ii) alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with Management, their ramifications and the preferences of the Auditors; and (iii) other material written communications between the Auditors and Management.

Review

1. Review and approve the appointment, termination or replacement by Management of the Vice President – Internal Audit (or similarly titled position) overseeing the internal auditing function ("VP–Internal Audit") and/or, at the discretion of the Board, select and contract with outside auditors to perform the function of an internal audit department.

2. Oversee the scope of the duties and activities of the VP–Internal Audit, who shall report directly to the Committee, and review and approve Management's recommendation of the compensation of the VP–Internal Audit.

3. Oversee the scope of the duties and activities of any outside auditors serving as internal auditors who shall report to the VP–Internal Audit (or in the absence of the VP–Internal Audit or otherwise determined by the Committee, directly to the Committee).

4. Periodically meet and review with the VP–Internal Audit, and/or any outside auditors serving as internal auditors, the regular internal reports to Management prepared by the internal auditing department and the progress of activities and any findings of major significance stemming from internal audits.

5. ***Review and discuss with Management and the Auditors the applicable Company quarterly or annual financial information prior to the quarterly earnings release or filing of the Company's Quarterly Report on Form 10-Q or Annual Report on Form 10-K, including the disclosures made under Management's Discussion and Analysis of Financial Condition and Results of Operations in any such Form 10-Q or Form 10-K.***

6. ***Discuss with financial management the Company's quarterly earnings releases or other press releases or Current Reports on Form 8-K providing significant financial information or earnings guidance.***

7. Upon completion of any annual audit, meet with the Auditors and

Management and review the Company's financial statements and related notes, the results of their audit, any report or opinion rendered in connection therewith, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information, any significant disagreements with Management concerning accounting or disclosure matters and any significant adjustment proposed by the Auditors.

8.      Review with the Auditors any audit problems or difficulties and Management's response.

9.      Review and consider with the Auditors and Management the matters required to be discussed by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301, Communications with Audit Committees, as may be amended, supplemented or superseded. These discussions should include consideration of the quality of the Company's accounting principles as applied in its financial reporting, including review of estimates, reserves and accruals, review of judgmental areas, review of audit adjustments whether or not recorded and such other inquiries as may be appropriate.

10.     Make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K.

11.     Obtain and review reports describing (i) the Auditors' internal quality-control procedures, (ii) material issues raised by the internal quality-control review, or peer review, of the Auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the Auditors, and any steps taken to deal with any such issues, and (iii) the relationships between the Auditors and the Company in order to assess the Auditors' independence.

Financial Reporting Processes

1.      Periodically meet with and discuss with Management, the Auditors and the internal audit department the adequacy and integrity of the Company's accounting policies and procedures and internal accounting controls, the completeness and accuracy of the Company's financial disclosure and the extent to which major recommendations made by the Auditors or the internal auditors have been implemented or resolved.

2.      Consider and approve, if appropriate, major changes to the Company's auditing or accounting principles and practices as suggested by the Auditors, Management, or the internal auditing department.

3.      Review with the Auditors, the internal auditing department and Management the extent to which such major changes have been implemented. This review should be conducted at an appropriate time subsequent to implementation of changes, as the Committee determines.

Process Improvement

1.      Establish systems of reporting to the Committee by each of Management, the Auditors and the VP–Internal Audit regarding any significant judgments made in Management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

2.      Periodically discuss with Management and the VP–Internal Audit policies with respect to risk assessment and risk management.

Ethical and Legal Compliance

1.      Establish procedures for (i) the receipt, retention and treatment of complaints received regarding accounting, internal accounting controls, auditing matters and (ii) the confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters.

2.      Review any disclosures provided by the Chief Executive Officer or the Chief Financial Officer to the Committee regarding (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data; and (ii) any fraud, including that which involves Management or other employees who have a significant role in the Company's internal controls.

3.      Investigate at its discretion any matter brought to its attention by, without limitation by enumeration, reviewing the books, records and facilities of the Company and interviewing Company officers or employees.

General

1.      Conduct an annual performance evaluation of the Committee.

2.      Perform any other activities consistent with this Charter, the Company's Certificate of Incorporation and Bylaws, the rules of the New York Stock Exchange ("NYSE") applicable to its listed companies, and governing law as the Committee or the Board deems necessary or appropriate.

3.      Make reports of its activities from time to time to the Board.

4.      Prepare annually a report meeting the requirements of any applicable SEC regulations to be included in the Company's proxy statement relating to its annual meeting of Stockholders.

5.      Perform such other duties and functions as the Board may from time to time determine or as may be required under any applicable law, rule or regulation, including regulations of the NYSE and SEC.

## THE COMPANY'S PROPER BUSINESS PRACTICES AND ETHICS POLICY

23.     According to the Company's Proper Business Practices and Ethics Policy:

[…] Crown Castle's books and records should accurately and fairly reflect Crown Castle's transactions in reasonable detail and in accordance with Crown Castle's accounting practices and policies (*See* "Books and Records").

\*      \*      \*

**Books and Records**

Crown Castle's books, records and accounts should accurately and fairly reflect the transactions of Crown Castle in reasonable detail and in accordance with Crown Castle's accounting practices and policies, including generally accepted accounting principles and Crown Castle's system of internal controls, as applicable. The following examples are given for purposes of illustration and are not intended to limit the generality of the foregoing in any way:

- No false, misleading or deliberately inaccurate books, records, accounts or entries should be made or caused to be made.
- No payment should be made with the intention or understanding that all or any part of it is to be used for any purpose other than that described by the documents supporting the payment.
- No undisclosed, unrecorded or "off-book" funds or assets should be established.
- No false or misleading statements (or omissions), written or oral, should be intentionally made to any internal or external accountant or auditor with respect to Crown Castle's financial statements or documents to be filed with the U.S. Securities and Exchange Commission ("SEC") or other governmental authority.
- No action to fraudulently influence, coerce, manipulate or mislead Crown Castle's internal or independent auditors should be made or taken.

IV.     **SUBSTANTIVE ALLEGATIONS**

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

**ISSUED DURING THE RELEVANT PERIOD**

24.    On February 26, 2018, Defendants caused the Company to file with the SEC its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"). Attached to the 2017 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by the Defendants Brown and Schlanger attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. All of the Individual Defendants signed the 2017 10-K.

25.    The 2017 10-K stated the following, in pertinent part, regarding the Company's internal controls:

**Controls and Procedures**

**(a)    Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

In connection with the preparation of this Annual Report on Form 10- K, as of December 31, 2017, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's [CEO] and [CFO], of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the [Exchange Act]). ***Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2017, were effective*** to provide reasonable assurance that information required to be disclosed by then Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

\* \* \*

Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. ***Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2017 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally***

*accepted accounting principles.*

\* \* \*

There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.  [Emphasis added].

26.     The 2017 10-K reported the Company's net income for the year ended December 31, 2017 at $444,550,000.

27.     The 2017 10-K reported the Company's adjusted EBITDA for the year ended December 31, 2017 at $2,481,761,000.

28.     On February 25, 2019, Defendants caused the Company to file with the SEC its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K").  Attached to the 2018 10-K were SOX certifications signed by Defendants Brown and Schlanger, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  Further, all of the Individual Defendants signed the 2018 10-K.

29.     The 2018 10-K stated the following, in pertinent part, regarding the Company's internal controls:

**Controls and Procedures**

**(a)     Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

In connection with the preparation of this Annual Report on Form 10- K, as of December 31, 2018, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's [CEO] and [CFO], of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the [Exchange Act]).  *Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2018, were effective* to provide reasonable

assurance that information required to be disclosed by the Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

**(b)      Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the Company. Under the supervision and with the participation of the Company's CEO and CFO, management assessed the effectiveness of the Company's internal control over financial reporting based on the framework described in "Internal Control – Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

*\* \* \**

***Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018.  Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2018 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.***

*\* \* \**

**(c)      Changes in Internal Control Over Financial Reporting**

There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.  [Emphasis added].

30.      The 2018 10-K reported the Company's net income for the year ended December

31, 2018 at $671,000,000.

31.     The 2018 10-K reported the Company's adjusted EBITDA for the year ended December 31, 2018 at $3,141,000,000.

32.     On May 3, 2019, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019 (the "1Q 2019 10-Q").  Attached to the 1Q 2019 10-Q were SOX certifications signed by Defendants Brown and Schlanger, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

33.     The 1Q 2019 10-Q stated the following regarding the Company's internal controls:

**CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's [CEO] and [CFO], of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the [CEO] and [CFO] concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019. [Emphasis added].

34.     The 1Q 2019 10-Q stated the following regarding the Company's net income:

Net income (loss) attributable to CCIC stockholders was income of $210 million during the first quarter of 2019 compared to income of $114 million during the first quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in expenses, including increases in

depreciation, amortization, and accretion and selling, general and administrative expenses.  [Emphasis added].

35.     The 1Q 2019 10-Q stated the following regarding the Company's EBITDA: "Adjusted EBITDA increased $58 million, or 8%, from the first quarter of 2018 to the first quarter of 2019.  Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments."

36.     On July 31, 2019, Defendants caused the Company to file with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 (the "2Q 2019 10-Q"). Attached to the 2Q 2019 10-Q were SOX certifications signed by Defendants Brown and Schlanger, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

37.     The 2Q 2019 10-Q stated the following regarding the Company's internal controls:

**CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's [CEO] and [CFO], of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the [CEO] and [CFO] concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019. [Emphasis added].

38.    The 2Q 2019 10-Q stated the following regarding the Company's net income:

Net income (loss) attributable to CCIC stockholders was income of $246 million
during the second quarter of 2019 compared to income of $180 million during the
second quarter of 2018. The increase was predominately related to net growth in
our Towers and Fiber segments, partially offset by an increase in expenses,
including increases in (1) selling, general and administrative expenses, (2)
depreciation, amortization and accretion, and (3) interest expense and amortization
of deferred financing costs.

39.    The 2Q 2019 10-Q stated the following regarding the Company's EBITDA:

"Adjusted EBITDA increased $88 million, or 11%, from the second quarter of 2018 to the second

quarter of 2019.   Adjusted EBITDA was positively impacted by the growth in our site rental

activities in both the Towers and Fiber segments."

40.    On October 16, 2019, the Company released its "Supplemental Information

Package and Non-GAAP Reconciliations" for the quarter ended September 30, 2019 (the "3Q

2019 Supplemental Information Package").   In the 3Q 2019 Supplemental Information Package,

adjusted funds from operations ("AFFO") was stated as $646,000,000 and $579,000,000 for the

three months ended September 30, 2019 and 2018, respectively, and $1,871,000,000 and

$1,683,000,000 for the nine months ended September 30, 2019 and 2018, respectively.

41.    That same day, the Company issued a press release entitled "CROWN CASTLE

REPORTS THIRD QUARTER 2019 RESULTS, PROVIDES OUTLOOK FOR FULL YEAR

2020 AND ANNOUNCES 7% INCREASE TO COMMON STOCK DIVIDEND," which

provided the Company's midpoint of 2020 full year outlook as: $5,219,000,000 for site rental

revenues;  $1,128,000,000 for net income; $3,592,000,000 for adjusted EBITDA; and

$2,685,000,000 for AFFO.

42.    On November 4, 2019, the Company filed with the SEC its Quarterly Report on

Form 10-Q for the quarter ended September 30, 2019 (the "3Q 2019 10- Q").  Attached to the 3Q

2019 10-Q were SOX certifications signed by Defendants Brown and Schlanger, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

43.     The 3Q 2019 10-Q stated the following regarding the Company's internal controls:

**CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's [CEO] and [CFO], of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the [CEO] and [CFO] concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019. (Emphasis added.)

44.     The 3Q 2019 10-Q stated the following regarding the Company's net income:

Net income attributable to CCIC stockholders was $244 million during the third quarter of 2019 compared to $136 million during the third quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in interest expense and amortization of deferred financing costs. [Emphasis added].

45.     The 3Q 2019 10-Q stated the following regarding the Company's EBITDA:

"Adjusted EBITDA increased $89 million, or 11%, from the third quarter of 2018 to the third quarter of 2019. Adjusted EBITDA was positively impacted by the growth in our site rental

activities in both the Towers and Fiber segments."

46.     The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's internal control over financial reporting and disclosures controls and procedures were ineffective and materially weak; (ii) the Company's financial accounting and reporting was not in accordance with GAAP; (iii) the Company's net income, adjusted EBITDA, and AFFO were inflated; (iv) the Company would need to restate its financial statements for the years ended December 31, 2018 and 2017, and unaudited financial information for the quarterly and year-to-date periods in the year ended December 31, 2018, and for the first three quarters in the year ended December 31, 2019; and (v) as a result, Individual Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

47.     On February 26, 2020, the Company issued a press release which announced the following:

> Our long-standing historical practice with respect to services revenues had been to recognize the entirety of the transaction price from our tower installation services as services revenues upon the completion of the installation services. ***After consultation with the [SEC's Office of the Chief Accountant], we concluded that our historical practice was not acceptable under GAAP***.
>
> * * *
>
> ***As a result, the preliminary impact to each of Net Income, Adjusted EBITDA and AFFO is a decrease of approximately $100 million for full year 2019 actuals and a decrease of approximately $90 million to our Previous 2020 Outlook***.

* * *

***Due to the identified errors described above, we will restate our financial statements for the years ended December 31, 2018 and 2017, and unaudited financial information for the quarterly and year-to date periods in the year ended December 31, 2018 and for the first three quarters in the year ended December 31, 2019***. Restated financial statements and financial information for the periods in question will be reflected in Crown Castle's Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 10-K"), which Crown Castle expects to file within the prescribed timeline for such report, including any available extension if needed to finalize the consolidated financial statements and disclosures and complete the associated audit work.

* * *

***Crown Castle has determined that the restatement of its previously issued financial statements as described above indicates the existence of one or more material weaknesses in its internal control over financial reporting and that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2019. Crown Castle will report the material weakness(es) in its 2019 10-K and intends to create a plan of remediation to address the material weakness(es)***. [Emphasis added].

48.     On this news, shares of the Company fell $14.29 per share, or 8.78%, to close at $148.40 per share on February 27, 2020.

## DUTIES OF THE DIRECTOR DEFENDANTS

49.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

50.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or

directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

51.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state

securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

52.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

53.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

54.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violation of Section 10(b) of the Securities Exchange Act of 1934 by the Director Defendants.

55.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

56.     Plaintiff is a current owner of the Company stock and has continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.   Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

57.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

58.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

59.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.   For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

60.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

61.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

62.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Brown**

63.     The principal professional occupation of Defendant Brown is his employment with the Company as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Additionally, Defendant Brown is a named defendant in the securities class actions entitled *Goering v. Castle Brands International Corp., et al.*, Case 2:20-cv-02943 (D. N.J.), *Griggs v. Castle Brands International Corp., et al.*, Case 20-cv-00843 (S.D. Tex.), and *La v. Castle Brands International Corp., et al.*, Case 2:20-cv-02156 (D. N.J.) (the "Securities Class Actions").  Demand on Defendant Brown is therefore excused.

**Defendants Bartolo, Garrison, Hogan and McKenzie**

64.     Demand is excused because Defendants Bartolo, Garrison, Hogan and McKenzie face a substantial likelihood of liability for their misconduct.

65.     During the Relevant Period, Defendants Bartolo, Garrison, Hogan and McKenzie served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure

controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

66.      Defendants Bartolo, Garrison, Hogan and McKenzie breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Bartolo, Garrison, Hogan and McKenzie face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Bartolo, Brown, Christy, Fitzgerald, Garrison, Goldsmith,**
**Hogan, Hutcheson, Martin, McKenzie, Melone and Moreland**

67.      Defendants Bartolo, Brown, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone and Moreland each signed the false and misleading 2017 10-K and 2018 10-K, which falsely represented that the Company was in compliance with its internal controls.   Demand on Defendants Bartolo, Brown, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone and Moreland is therefore excused.

### COUNT I

**(Against the Director Defendants for Breach of Fiduciary Duty)**

68.      Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

69.      The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

70.      The Director Defendants violated and breached their fiduciary duties of care,

loyalty, reasonable inquiry, and good faith.

71.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

72.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

73.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

76.     As a result of the misconduct described above, the Director Defendants wasted

corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

77.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

78.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### (Against Defendants Brown And Schlanger For Unjust Enrichment)

79.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

80.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants Brown and Schlanger were unjustly enriched at the expense of, and to the detriment of, the Company.

81.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants Brown and Schlanger and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendant Brown and Schlanger and due to his wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     During the Relevant Period, the Individual Defendants disseminated or approved public statements that failed to disclose that (i) the Company's internal control over financial reporting and disclosures controls and procedures were ineffective and materially weak; (ii) the Company's financial accounting and reporting was not in accordance with GAAP; (iii) the Company's net income, adjusted EBITDA, and AFFO were inflated; (iv) the Company would need to restate its financial statements for the years ended December 31, 2018 and 2017, and unaudited financial information for the quarterly and year-to-date periods in the year ended December 31, 2018, and for the first three quarters in the year ended December 31, 2019; and (v) as a result, Individual Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.

84.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

85.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue

of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

86.     As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 30, 2020

**O'KELLY & ERNST, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Telephone: (302) 778-4000
Facsimile: (302) 295-2873
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*